**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Anthony Betts,<br><br>            Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of the Social Security Administration,<br><br>            Defendant. | No. CV10-02189-PHX-NVW<br><br>**ORDER** |

Michael Anthony Betts seeks review under 42 U.S.C. § 405(g) of the decision of the Commissioner of Social Security ("the Commissioner") denying disability benefits. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and not based on legal error, the Commissioner's decision will be affirmed.

**I.    Background**

   **A.    Procedural History**

On April 27, 2007, Betts filed applications for Disability Insurance Benefits under sections 216 and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and Supplemental Security Income under sections 1602 and 1614(a)(3)(A) of Title XVI of the

Social Security Act, 42 U.S.C. § 1381a.[1] The State agency and the Social Security Administration denied Betts' applications initially and upon reconsideration. On September 21, 2009, pursuant to Betts' request, a hearing de novo was held at which Betts, his legal counsel, and a vocational expert appeared. On February 4, 2010, the ALJ issued a decision on February 4, 2010, that the Plaintiff was not disabled within the meaning of the Social Security Act. On August 20, 2010, the Appeals Council denied Betts' request for review of the hearing decision. The ALJ's decision therefore became the Commissioner's final administrative decision. On October 14, 2010, Betts sought judicial review pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**B.  Factual Background**

Betts was born on June 20, 1964, and was forty-one years old as of the alleged disability onset date of February 7, 2006. Betts has been diagnosed with bipolar disorder, depression, posttraumatic stress disorder, and generalized anxiety disorder. He has at least an eighth grade education.

From 1991 to February 2006, Betts worked as an unarmed security guard. On February 7, 2006, while working as a security guard at a townhouse complex, Betts received left shoulder and right knee injuries from being struck by a vehicle. Betts' medical records are inconsistent regarding whether Betts lost consciousness during the incident, but subsequent examinations indicated normal neurological functioning, and a brain MRI in October 2007 was normal.[2]

---

[1] Because regulations for disability determinations under Titles II and XVI of the Social Security Act, governing Disability Insurance Benefits and Supplemental Security Income benefits respectively, mirror each other, citations to regulations will be to Disability Insurance Benefits regulations without citation to parallel Supplemental Security Income benefits. All citations are to the 2010 edition of the Code of Federal Regulations.

[2] Although Betts' testified that his mental impairments were caused by the incident during which he sustained physical injuries, this appeal does not involve any of Betts' physical injuries.

In his April 2007 application for Disability Insurance Benefits and Supplemental Security Income benefits, Betts alleged that he had been unable to work since February 7, 2006.[3] He also alleged that he was unable to work because of posttraumatic stress disorder, panic attacks, anxiety, anger, and inability to focus, follow directions, or think clearly. He subsequently added bipolar disorder and memory problems to his list of disabling conditions.

**1.    Treatment**

From February 2006 to February 2008, Betts received treatment with medication for hypertension, anxiety, and depression at Sun Valley Family Care, Phoenix, Arizona. From May 2007 to November 2008, Betts received treatment with counseling and medication for posttraumatic stress disorder and an adjustment disorder at Phoenix Interfaith Counseling, Phoenix, Arizona. From August 2008 to August 2009, Alvin Burstein, M.D., treated Betts with medication for posttraumatic stress disorder. From September 2008 to May 2009, Betts received treatment with medication for depression and anxiety from Magellan Health Services, which found Betts eligible for Seriously Mentally Ill services in May 2009. In September 2008, Betts received inpatient treatment from Magellan for suicidal ideation after discontinuing psychiatric medication. From December 2008 to June 2009, Betts received treatment through Terros, Inc. From June 2009 to August 2009, Betts received treatment with medication and counseling for posttraumatic stress disorder and depression from Southwest Network, Inc.

On September 29, 2007, Betts was treated at Paradise Valley Hospital, Phoenix, Arizona, for a reported inadvertent medication overdose. He was diagnosed with anxiety, depression, and a minor medication overdose.

---

[3]Betts reportedly attempted a return to work in October 2006, but this lasted only one week.

### 2. Examinations and Evaluations

On August 28, 2007, Betts was examined by Marcel Van Eerd, Psy.D., a consultative psychologist for the Arizona Department of Economic Security Disability Determination Services. Dr. Van Eerd's report states that Betts sought benefits because of alleged posttraumatic stress disorder and shoulder injury. The report indicates that Betts said he lives by himself and is able to manage his own hygiene, dress, medications, meal preparation, and household chores, including vacuuming, laundry, and dishes. It also states that Betts reported sleep difficulty, problems with clarity and thought, anger, and suicidal ideation with anxiety and nausea. Dr. Van Eerd diagnosed Betts with generalized anxiety disorder and depressive disorder not otherwise specified. Dr. Van Eerd opined that Betts is capable of managing benefit payments in his own interest.

Dr. Van Eerd assessed Betts as "not significantly limited" in his ability to understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others. Dr. Van Eerd assessed Betts as "moderately limited" in his ability to remember locations and work-like procedures, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes

in the work setting. Dr. Van Eerd did not find Betts to have "no evidence of limitation" or to be "markedly limited" in any area.

On September 21, 2007, Martin B. Koretzky, Ph.D., a State agency psychologist reviewed Betts' medical records. He concluded that Betts was "not significantly limited" in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar place, use public transportation, set realistic goals, and make plans independently of others. Dr. Koretzky concluded Betts was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

On October 12, 2007, Catherine S. O'Connell, Ph.D., performed a psychological evaluation of Betts. She reported that on the MMPI-2 Betts "endorsed a wide variety of psychological symptoms," which reflected either a confused state, significant psychological decompensation, an exaggeration of psychological symptoms, low reading level, or a plea for help. She opined that in Betts' case this response likely reflected a plea for help, but could also reflect some exaggeration of these symptoms.

On December 5, 2007, Samuel Blumenfeld, M.D., a State agency psychiatrist, concluded that Betts was not significantly limited in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, work in coordination or proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals and make plans independent of others. Dr. Blumenfeld opined that Betts was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities with in a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest period, and respond appropriately to changes in the work setting.

On February 19, 2008, mental health nurse practitioner Marian Letellier, of Interfaith Counseling, assessed Betts as having a severe impairment in his ability to relate to other people, respond appropriately to supervision and co-workers, respond to customary work pressures, perform complex or varied tasks, complete a normal workday/workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number/length of rest periods. She assessed him as having a moderately severe impairment of his ability to understand, carry out, and remember instructions, perform simple tasks, and perform repetitive tasks.

1  **II.     Standard of Review**

2         The district court reviews only those issues raised by the party challenging the
3  ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The district
4  court may set aside the Commissioner's disability determination only if the determination
5  is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495
6  F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a
7  preponderance, and relevant evidence that a reasonable person might accept as adequate
8  to support a conclusion considering the record as a whole. *Id.* In determining whether
9  substantial evidence supports a decision, the court must consider the record as a whole
10 and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.*
11 As a general rule, "[w]here the evidence is susceptible to more than one rational
12 interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be
13 upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

14       The ALJ is responsible for resolving conflicts in medical testimony, determining
15 credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.
16 1995). However, in reviewing the ALJ's reasoning, the court is "not deprived of [its]
17 faculties for drawing specific and legitimate inferences from the ALJ's opinion."
18 *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

19 **III.    Analysis**

20       To determine whether a claimant is disabled for purposes of the Social Security
21 Act, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a).
22 The claimant bears the burden of proof on the first four steps, but at step five, the burden
23 shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the
24 first three steps, the ALJ found (1) Betts had not performed substantial gainful activity
25 during the relevant period, (2) he had suffered impairments that are severe when
26 considered in combination, and (3) his impairments did not meet criteria for presumptive
27 disability. Betts does not challenge the findings at the first three steps.
28

**A.   The ALJ Did Not Err in Assigning Weight to Medical Source Opinions.**

  **1.   Legal Standard**

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id.* A treating physician's opinion is afforded great weight because such physicians are "employed to cure and [have] a greater opportunity to observe and know the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. Moreover, the Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results. *Id.* at 832-33.

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician. *Id.* at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id.* at 831. "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Factors that

- 8 -

an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631.

Moreover, Social Security Rules expressly require a treating source's opinion on an issue of a claimant's impairment be given *controlling* weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). If a treating source's opinion is not given controlling weight, the weight that it will be given is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors. *Id.*

Finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion should be rejected:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Orn*, 495 F.3d at 631-32 (quoting Social Security Ruling 96-2p). Where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record. *Id.* at 632.

### 2. Mental Health Nurse Practitioner Marian Letellier

In addition to evidence from acceptable medical sources identified in 20 C.F.R. § 404.1513(a), the ALJ is permitted to consider evidence from other sources, including medical sources not listed in § 404.1513(a), such as nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R.

§ 404.1513(d)(1). Here, the ALJ considered both Nurse Letellier's progress notes and her February 2008 assessment. Although Nurse Letellier assessed Betts as having severe impairments in his ability to respond appropriately to supervision and co-workers and complete a normal workday/workweek without interruptions from psychological symptoms, her progress notes described him at times as being in good spirits, "mildly anxious," pleasant, having good concentration and intact memory, and "bordering on verbose." The ALJ did not err by finding no compelling reason to give her "other source" opinion greater weight than the opinions of the acceptable medical sources present in the case record because Nurse Letellier failed to address the inconsistencies between her progress notes and her February 2008 assessment.

### 3. Examining Psychologist Marcel Van Eerd, Psy.D.

The ALJ "accorded the greatest weight" to the opinion of Dr. Van Eerd, a consultative psychologist because he is board certified and "an expert in evaluating disability claims under the Social Security Act." However, the ALJ did not say that he gave Dr. Van Eerd's opinion *controlling* weight. *See* Social Security Ruling 96-2p ("Controlling weight may be given only in appropriate circumstances to medical opinions . . . from treating sources.")

Dr. Van Eerd is not a treating source. He examined Betts and assessed him as having some limitation in every area—either "not significant" or "moderate," which the ALJ found to be more credible than that of the state agency medical consultants, who found no limitations in many areas, because the ALJ was able to directly observe Betts' limitations during his hearing testimony. In fact, the ALJ determined Betts' residual functional capacity as having more limitations, *i.e.*, no requirement for interaction with the public and no requirement for interaction with co-workers in order to complete work-related tasks, than did Dr. Van Eerd's assessment.

Dr. Van Eerd assessed Betts as being "moderately limited" in, among other things, his ability to maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically

1  based symptoms. The assessment form defines "moderately limited" as "fair/limited but
2  not precluded." Thus, in Dr. Van Eerd's opinion, Betts is not precluded from maintaining
3  regular attendance, being punctual, and completing a normal workday and workweek
4  without interruptions. But even if Dr. Van Eerd meant that he believed Betts likely would
5  be absent from the workplace on a fairly regular basis, the ALJ was not required to give
6  such an opinion controlling weight.
7  Moreover, the ALJ was not required to explain why he did not include "no
8  requirement for regular attendance" in Betts' residual functional capacity. Although
9  Nurse Letellier assessed Betts as being severely limited in his ability to complete a
10 normal workday/workweek without interruptions from psychological symptoms, the ALJ
11 explicitly stated his reasons for giving her opinions less weight, and Betts has not
12 identified any other source who gave a similar opinion.

### B. The ALJ Did Not Err in Evaluating Betts' Credibility.

14 In evaluating the credibility of Betts' testimony regarding subjective pain or other
15 symptoms, the ALJ was required to engage in a two-step analysis: (1) determine whether
16 Betts had presented objective medical evidence of an impairment that could reasonably be
17 expected to produce some degree of the symptoms alleged; and, if so with no evidence of
18 malingering, (2) reject Betts' testimony about the severity of the symptoms only by
19 giving specific, clear, and convincing reasons for the rejection. *See Vasquez v. Astrue*,
20 572 F.3d 586, 591 (9th Cir. 2009). To support a lack of credibility finding, the ALJ is
21 required to point to specific facts in the record that demonstrate that Betts' symptoms are
22 less severe than he claims. *Id.* at 592.
23 At the hearing, Betts testified that he was unable to work because of his mental
24 problems. He said that when he is around people, he feels like people are talking about
25 him, judging him and thinking he is a loser because he "couldn't even do that job right."
26 He said he gets into verbal confrontations with people "out of the blue." He said he has
27 mood swings "from totally depressed to explosive behavior." He said he attempted
28 suicide once with medications because he was "just feeling very low that day." He said

he has anxiety attacks, during which he feels "very nervous," "panic," and as though he is going to faint. He said he feels depressed because he had problems with the job in which he was injured and he had requested to be taken off the post two weeks before the incident because of threats he received from gang members. Betts' testimony did not explain why he would be unable to perform an unskilled job that did not require interaction with other people.

The ALJ concluded that Betts' medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment. He gave specific, clear, and convincing reasons for the rejection and supported his lack of credibility finding by pointing to specific objective medical facts in the record that demonstrate Betts' symptoms are less severe than he claims. The ALJ cited to numerous progress notes that reported Betts had a definite improvement of mood, medication gave Betts better control of his depression, and he showed a positive improvement with medication and further counseling. The ALJ also cited to Betts' significantly inconsistent accounts of the work injury and Dr. O'Connell's opinion that Betts' self-reported "wide variety of psychological symptoms" could reflect an "exaggeration of psychological symptoms."

### C. The ALJ's Mental Residual Functional Capacity Determination Is Supported by Substantial Evidence and Not Based on Legal Error.

Before considering step four of the sequential evaluation process, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the most the claimant can do in a work setting despite his limitations. 20 C.F.R. § 404.1520(e). In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(e), 404.1545.

Here, after consideration of the entire record, the ALJ found that Betts has "the residual functional capacity to perform work at all exertional levels, but with the

following nonexertional limitations: the claimant is limited to unskilled work, with no requirement for interaction with the public, and no requirement for interaction with co-workers in order to complete work-related tasks. Although in his appeal brief Betts contends "the ALJ erred by limiting the mental residual functional capacity determination to a finding 'the claimant is limited to unskilled work, with no requirement for interaction with the public, and no requirement for interaction with co-workers in order to complete work-related tasks,'" the brief does not identify how the ALJ allegedly erred. The brief merely states, "This issue, and other issues, are moot once either the assessment of the agency's examining psychologist or the assessment of the treating source is accepted, since a finding of disability would follow from those assessments according to the uncontradicted testimony of the agency's vocational expert." As concluded above, the ALJ did not err in assigning weight to the agency's examining psychologist or the assessment of the treating source.

To the extent that Betts contends the ALJ erred by using the term "unskilled work" in the residual functional capacity rather than specific functional limitations on requirements to understand, carry out, and remember simple job instructions, the record as a whole does not support finding Betts is significantly—or even moderately—limited in his ability to understand, carry out, and remember simple job instructions. Moreover, the record would support finding Betts is not significantly limited in his ability to understand and remember detailed instructions and only moderately limited in his ability to carry out detailed instructions.

### D. Betts Lacks the Residual Functional Capacity to Perform His Past Relevant Work.

At step four of the sequential evaluation process, the ALJ concluded that Betts is unable to perform any of his past relevant work. Betts' past relevant work as a security guard requires a sedentary to light exertional capacity and the ability to perform semi-skilled tasks. His residual functional capacity limits him to performing unskilled work,

1  and therefore he is unable to perform any of his past relevant work.  On appeal, Betts
2  does not challenge this finding.

### E. Betts Is Able to Do Other Work that Exists in Sufficient Numbers.

At step five, after having determined that a claimant's disabilities prevent him from doing his past relevant work, an ALJ is required to decide whether the claimant's impairments prevent him from performing other work that exists in the national economy, considering his residual functional capacity, age, education, and work experience. Social Security Ruling 00-4p.  To show that a claimant can perform other work, the Commissioner must use a vocational expert to meet his burden of proof if other reliable evidence is not available. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ asks hypothetical questions of the vocational expert containing the details of the claimant's impairments; the expert then recounts the number of suitable positions available for the claimant in the national economy. *Id.*  The vocational expert's opinion has no evidentiary value if the assumptions in a hypothetical question are not supported by the record. *Id.*  Moreover, the ALJ is not required to accept as true the restrictions presented in a hypothetical question posed by the claimant's counsel. *Id.*

During the September 21, 2009 hearing, the ALJ asked vocational expert Mark Kelman whether jobs exist in the state and national economy that could be performed by a forty-five year old unskilled person who could lift up to fifty pounds occasionally and lesser weights more frequently, could not interact with the public, and could not interact with or depend on co-workers to complete the job.  Kelman responded that such a person could perform janitorial jobs, housekeeping, and hand packagers, and he provided the numbers of such jobs existing statewide and nationally.

Additionally, the ALJ asked, "Now, if a person were going to be absent from the workplace and it would occur on a fairly regular basis, what would be permissible?" Kelman responded that, "with unskilled jobs, missing one day on a consistent ongoing basis presents a problem in terms of maintaining employment." He also stated that missing two or more days on a regular basis could lead to termination.  Since neither the

question nor the answer unambiguously defines the hypothetical absentee rate assumed, *i.e.*, one day per week, month, or year, this testimony is meaningless. Further, because the record does not support finding that Betts is precluded from regular attendance and completing a normal workday and workweek, the ALJ did not err by failing to include such a limitation in the residual functional capacity, and Kelman's opinion based on "regular" or "consistent" absenteeism has no evidentiary value.

Betts' attorney asked Kelman whether a person with moderate limitations in ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting would be able to sustain work-related activities on a regular and continuing basis. Kelman responded that "such a person would be precluded from all competitive employment based on the cumulative effect of those moderates in those areas." However, again, by identifying Betts' ability to maintain regular attendance as "moderate," Dr. Van Eerd explicitly indicated that Betts' impairments do not preclude him from regular attendance.

Moreover, the ALJ was not required to accept as true the restrictions posed in Betts' attorney's hypothetical question based on Dr. Van Eerd's assessment. Nor was the ALJ required to accept as true the restrictions posed in Betts' attorney's hypothetical question based on Nurse Letellier's assessment of severe limitations. The record supports the ALJ's determination of a residual functional capacity that does not include any limitation for inability to maintain regular attendance or complete a normal workday or workweek. Therefore, Kelman's opinions based on hypotheticals that included limitations for inability to maintain regular attendance or complete a normal workday or workweek have no evidentiary value. The ALJ was not required to give those opinions any consideration.

Because the denial of disability benefits will be affirmed, Betts' request for remand for award of benefits or for further administrative proceedings must be denied also.

IT IS THEREFORE ORDERED affirming the final decision of the Commissioner of Social Security denying Michael Anthony Betts disability benefits.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant against Plaintiff and that Plaintiff take nothing. The Clerk shall terminate this action.

DATED this 22nd day of August, 2011.

_____
Neil V. Wake
United States District Judge